**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| TOMAS CEREZO-MARTIN,<br><br>Plaintiff<br><br>v.<br><br>FERROVIAL AGROMAN, S.A.,<br><br>Defendant | CIVIL NO. 15-1350<br><br>CIVIL RIGHTS; TITLE VII<br><br>PLAINTIFF DEMANDS TRIAL BY JURY |

**COMPLAINT**

**TO THE HONORABLE COURT:**

    **COMES NOW** the Plaintiff, and through the undersigned attorneys, very respectfully avers and prays as follows:

### I.   INTRODUCTION

1. This is a civil action brought pursuant to Title VII of the Civil Rights Act of 1991, 42 U.S.C. §§'s 2000e *et seq.*; Commonwealth Law 100 of June 30, 1959 as amended, 29 L.P.R.A. §§'s 146 *et seq and* Commonwealth Law 80 of May 30 1976 as amended, 29 L.P.R.A §§'s 185a *et seq.*

### II.   JURISDICTION & VENUE

2. The jurisdiction of this Honorable Court is hereby invoked under 28 U.S.C. § 1331 and § 1343(3), since the action arises

under the laws of the United States. Supplemental Jurisdiction is also invoked under 28 U.S.C. § 1367. The state claims are related to the federal claims in this action, since they form part of the same case or controversy under Article III of the United States Constitution as provided by 28 U.S.C. § 1367(a). Venue lies on this district pursuant to 28 U.S.C.A. § 1391(a)(2) because the instant claims arose in the district of Puerto Rico.

### III. THE PARTIES

3. Plaintiff Tomas Cerezo-Martin(Hereinafter "Mrs. Cerezo-Martin") is a resident of the Commonwealth of Puerto Rico, a Spanish National and the victim of the Defendant's employees and officers discriminatory acts.

4. Defendant Ferrovial Agroman, S.A. (Hereinafter "Ferrovial" or the "Defendant") is a duly organized business society with the capacity to sue and be sued under the laws of the Commonwealth of Puerto Rico. The Defendant was Plaintiff's employer and whose employees and officials discriminated against Mr. Cerezo-Martin.

### IV. THE FACTS

5. Plaintiff Tomas Cerezo-Martin is a Spanish National born and raised in and near the city of Salamanca.

6. On May, 2005 Plaintiff worked for a month as a foreman for Ferrovial Agroman, S.A, on a project located in the town of Utuado.

7. Mr. Cerezo-Martin started working again with Ferrovial on the year 2009 on a project located at PR-1 in San Juan.

8. During that time Plaintiff worked with Ferrovial until the year 2010, when he was forced to resign due to death threats of that he was receiving from an employee called Miguel after Mr. Cerezo-Martin had ordered him to perform a specific duty.

9. Plaintiff had informed this to the head of security of Ferrovial and to his supervisor, but they just ignored him; leaving him no other choice but to quit his position at Ferrovial.

10. On December of 2011, Mr. Noel Cintron, an executive from Ferrovial contacted Plaintiff and asked him if he wanted to return to work with them.

11. Plaintiff told him he needed the work, but the last time that he had worked there he had received threats from another employee and that nobody came to his aid, even though he had complained about it.

12. Mr. Cintron told him not to worry about it, since he was going to assign him to a project in Paseo de la Real Marina in Aguada, far away from Miguel.

13. Under those conditions Plaintiff agreed to return to work at Ferrovial and he started on January of 2011.

14. Notwithstanding this, three(3) months later Plaintiff was again assigned to the PR-1 project where he had had to resign due to the death threats that he had received.

15. Plaintiff protested, but he was told by Mr. Cintron that that was what they had available at the time and that Plaintiff had to report there.

16. Plaintiff dreaded going back to that project due to the previous situation, but he had no choice but to accept since he had a family to feed.

17. Not surprisingly, a couple of days after he started working there Miguel showed up with a handgun threatening to shoot Plaintiff.

18. Plaintiff immediately went to the head of security to inform his of this and to his surprise the response was to call him a "Spaniard chicken shit" and that he was going to get him a gun so he could shoot Miguel since that was how real men dealt with those types of problems in Puerto Rico.

19. Plaintiff complained about this to the project supervisors, engineers Jorge Rivera y Adalberto Santiago who listened to him uninterestedly and refused to intervene.

20. After learning about this complaint, the head of security, Mr. Correa, started harassing Plaintiff almost daily.

21. Mr. Correa would continuously mock Plaintiff in front of other employees because of his accent and nationality and would tell him and others in from of him that how it was possible that the Defendant hired a Spaniard to perform a job that any Puerto Rican could do.

22. After this abuse continued Plaintiff again complained to engineers Jorge Rivera y Adalberto Santiago, this time Mr. Santiago told him to quit "whining" so much and that that's the way that things are at a construction project.

23. Plaintiff continued receiving abuse and xenophobic insults almost daily from Correa and other employees at the project.

24. When he again complained to Engineer Santiago on July of 2013 about the fact that the xenophobic insults continued, this supervisor started cursing at him, telling him that he was tired of his complaints and that if he didn't like it here that he could go back to Spain, where perhaps he should be at.

25. Plaintiff felt a sense of dejection, since working at that environment was a living hell.

26. Unfortunately, he couldn't quit his job since he needed the money and he has just bought a new house and the only thing that he knew what to do was working as a construction site foreman; an occupation whose demand was dwindling due to the bursting of the construction bubble in the Island.

27. Plaintiff went to speak directly with Noel Cintron to explain to him what was going on and pleading for help.

28. Mr. Cintron told Plaintiff that he would look into the matter.

29. Things got so bad for Plaintiff, that once the employees under his supervision saw that they could insult him and mock him due to his nationality, they started doing it too.

30. For example, in mid 2013, Plaintiff asked an employee named Efrain Maldonado to clean some tiles.

31. Mr. Maldonado's response was to say that who this "little Spaniard(españolito) with his gay accent though he was" and that he would clean those tiles when he could and that if he continued to bother him that he was going to beat him up.

32. Plaintiff again went to Noel Cintron to inform him what was going on, since now not only supervisors where insulting him, but even the employees under his command refused to listen to him and insulted him freely.

33. To his surprise, instead of supporting him and disciplining those xenophobic employees, Mr. Cintron told Plaintiff that he was tired of this situation and of Plaintiff's constant complaints about it and that construction projects are tough environments were that type of language was common.

34. Plaintiff told him that he knew that, but that constant xenophobic comments and physical threats are not acceptable on any workplace.

35. A couple of days later, Plaintiff visited Mr. Cintron's offices to ask for approval for his vacation period.

36. Ferrovial always closes operations during the Christmas period, so Plaintiff usually used that time to take his eight year old daughter with him and visit his family in Spain.

37. Pursuant to this, Plaintiff asked for the usual vacation period that he had always been granted.

38. Mr. Cintron seemed kind of hesitant and told Plaintiff to talk about it later.

39. While Plaintiff was at Mr. Cintron's office he also asked him about the prospects of receiving a raise, since a newly hired foreman, who was Puerto Rican, was making a lot more than him; even though he had less employees under his supervision than Plaintiff.

40. After hearing this, Mr. Cintron exploded and told Plaintiff that if he wanted to pay a Puerto Rican foreman more than him, it was his problem, not Plaintiff's and to forget about any vacations to Spain this year. He then proceeded to tell Plaintiff to get out of his office.

41. Since it was obvious that Cintron was not going to talk to Plaintiff about his vacations, he talked to Engineer Santiago who also had the authority to approve his requested vacation period.

42. After a couple of weeks of pleading with him, Mr. Santiago relented and authorized Plaintiff's vacation period, after Mr. Cerezo-Martin explained to him that the flights available near Christmas day were almost twice as expensive and with numerous

connecting flights along the way, something that would be harsh on his 8 year old daughter.

43. After meeting with Mr. Santiago and Mr. Cintron again related to this issue, he saw that they were not pleased with him leaving, so he offered to postpone his trip to summer of 2014.

44. Mr. Santiago refused and told him that all employees had to take their vacation period during Christmas, which was the time that the company had its yearly shutdown.

45. After talking quietly between themselves, Mr. Santiago told Plaintiff in front of Mr. Cintron that he could take his requested vacations between December 16 of 2013 and January 10, 2014.

46. When Plaintiff asked if he needed to file out a new document, Mr. Santiago told him not to worry about it that they had approved it.

47. Based on the approval given by his supervisors, Plaintiff bought his and his daughter's tickets to Spain on November 16, 2013.

48. A couple of days before leaving Plaintiff suffered a stomach virus which forced him to go to the doctor and miss work on the 14th of December, which he informed to Ferrovial.

49. After coming back from Spain, Plaintiff reported back to work on January 13, 2014.

50. To his surprise, he was told that he had been fired because he went on vacation without authorization, something that was false.

51. It was obvious that the authorization given to Plaintiff by Engineer Santiago was made with the intention of him missing work and justifying his dismissal.

52. Both Mr. Santiago and Mr. Cintron had told Plaintiff on a number of occasions that they were tired of him complaining about the harassment that he was receiving due to his national origin, going as far as to tell him that he should go back to his native country.

53. Mr. Cerezo-Martin had always been a model employee, so the only way to try and get rid of him was to authorize his requested vacation period and then claim that that he left to Spain without permission.

54. On February of 2014, Plaintiff filed a Charge of Discrimination with the San Juan Office of the Equal Employment Opportunity Commission regarding the harassment suffered and his dismissal due to him complaining to his employer about it.

55. On January 16, 2015, the Equal Opportunity Employment Commission issued Plaintiff a Right to Sue Letter.

56. Plaintiff has suffered and continues to suffer great mental anguish due to the acts of the Defendants. He was deprived of his job, leaving him unable to support her family. Plaintiff feels a sense of dejection and the psychological damage that he

has suffered as a result of his illegal dismissal and the mistreatment and humiliations that he suffered due to him not being Puerto Rican.

57. All the injuries, damages, mental anguish and suffering endured by the Plaintiff were caused by the Defendant's employees and/or officials actions and/or negligence.

## V. FIRST CAUSE OF ACTION

### (Compensatory Damages under Title VII)

58. The allegations contained in paragraph No. 1 through No. 57 of this Complaint are incorporated by reference as if fully set forth herein by Plaintiff.

59. The facts set forth in this Complaint constitute a violation of Plaintiff's rights under the Title VII of the Civil Rights Act of 1964; 42 U.S.C. §§'s 2000e *et seq.* due to his national origin.

60. As a result, compensatory damages for the emotional distress, pain and suffering, mental anguish and loss in his enjoyment of life in an amount of not less than $500,000 under Title VII against Ferrovial Agroman S.A. are requested.

## VI. SECOND CAUSE OF ACTION

### (Punitive Damages under Title VII)

61. The allegations contained in paragraph No. 1 through No. 60 of this Complaint are incorporated by reference as if fully set forth herein by Plaintiff.

62. The facts set forth in this Complaint constitute a violation of Plaintiff's rights under the Title VII of the Civil Rights Act of 1964; 42 U.S.C. §§'s 2000e *et seq.* due to his national origin.

63. Punitive Damages in an amount of not less than $500,000 under Title VII are requested since Defendant Ferrovial Agroman S.A. has engaged in intentional discrimination when terminating Plaintiff from his job for complaining about the xenophobic actions of his fellow employees and it did so with malice and/or with reckless indifference to his federally protected rights.

## VII. THIRD CAUSE OF ACTION

### (Back Pay and Reinstatement Under Title VII)

64. The allegations contained in paragraph No. 1 through No. 63 of this Complaint are incorporated by reference as if fully set forth herein by Plaintiff.

65. The facts set forth in this Complaint constitute a violation of Plaintiff' rights under the Title VII of the Civil Rights Act of 1964; 42 U.S.C. §§'s 2000e *et seq.* due to his national origin.

66. As a direct result of the unlawful actions of Defendant Ferrovial Agroman S.A., Plaintiff is entitled to an award for back pay under Title VII to be paid for the wages, salary and fringe benefits that he would had earned from the date of his termination to the date that the jury trial takes place and to be reinstated to his former position at Ferrovial.

67. Said amount is estimated at no less than $80,000, but it's subject to increase, depending on the date that the jury trial takes place.

## VIII. FOURTH CAUSE OF ACTION

**(Commonwealth Law No. 100)**

68. The allegations contained in paragraph No. 1 through No. 67 of this Complaint are incorporated by reference as if fully set forth herein by Plaintiff.

69. The facts set forth in this Complaint constitute discrimination at the workplace due to national origin and thus are in violation of Commonwealth Law No. 100 of June 30, 1959 as amended, 29 L.P.R.A. §§'s 146 *et seq.*

70. Thus, Plaintiff is entitled to an award of no less than $500,000 under Law No. 100 for the pain, emotional distress and the loss of salary, wages, commissions and fringe benefits that he has suffered due to the Defendant's actions.

71. In addition, the total amount that will be awarded as damages and which are requested in this Complaint under Federal and State law are subject to be doubled pursuant to 29 L.P.R.A. § 147(a).

## IX. FIFTH CAUSE OF ACTION

**(Commonwealth Law No. 80)**

72. The allegations contained in paragraph No. 1 through No. 71 of this Complaint are incorporated by reference as if fully set forth herein by Plaintiff.

73. Plaintiff's dismissal was an unjustified one pursuant to Commonwealth Law No. 80 of May 30 of 1976, 29 L.P.R.A. §§'s 185(a) *et seq*.

74. As a result, Plaintiff is entitled to an award of $8,000 for his unjustified dismissal, applying the formula expounded on 29 L.P.R.A. § 185(a), to be paid by the Defendant.

### X. ATTORNEY FEES, COST AND PREJUDGMENT INTERESTS

75. The allegations contained in paragraph No. 1 through No. 74 of this Complaint are incorporated by reference as if fully set forth herein by Plaintiff.

76. The Defendant is hereby liable to Plaintiff for all sums hereby requested as well as for all pre-judgment and post-judgment interest, costs and attorney fees pursuant to Title VII of the Civil Rights act of 1964 and 42 U.S.C. § 1988.

77. Recovery of attorney fees, costs incurred and interest accrued are also available under the Commonwealth laws invoked in this Complaint.

### XI.  JURY TRIAL

78. Plaintiff hereby invokes his right to a jury trial pursuant to the Seventh Amendment of the United States Constitution for all issues so triable.

## XII. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully pray for this Honorable Court to enter Judgment imposing on Defendant the payment of a) a compensation of no less than $1,080,000.00 under Title VII of the Civil Rights Act of 1964; b) a compensation of no less than $500,000.00 under Commonwealth Law No. 100; c) a compensation of no less than $8,000.00 under Commonwealth Law No. 80; d) that the aforementioned amounts be doubled pursuant to 29 L.P.R.A. § 147(a); e) all with interest, attorney fees and the costs of the litigation, as well as any other remedy that this Honorable Court deems proper.

**RESPECTFULLY SUBMITTED** in Caguas, Puerto Rico on this 6th day of April of 2015.

**FRANCIS & GUEITS' LAW OFFICES**
PO Box 267
Caguas, PR 00726
Tel.(787)745-3100
Fax. (787) 745-3100
E-Mail: jgueits@fglawpr.com
cfrancis@fglawpr.com

**S/JOSÉ J. GUEITS-ORTIZ**
**JOSÉ J. GUEITS-ORTIZ**
U.S.D.C.-P.R. Bar No. 224704

**S/CHRISTIAN J. FRANCIS-MARTÍNEZ**
U.S.D.C.-P.R. Bar No. 227105

**COMPLAINT**
Tomas Cerezo-Martin v. Ferrovial Agroman S.A.

15

**COMPLAINT**
Tomas Cerezo-Martin v. Ferrovial Agroman S.A.
15